E. P. Harwell and Mary W. Harwell v. Commissioner.
Harwell v. Commissioner
Docket No. 7842.
United States Tax Court
1947 Tax Ct. Memo LEXIS 207; 6 T.C.M. (CCH) 541; T.C.M. (RIA) 47134; May 15, 1947
*207 Philip L. Kelton, Esq., and W. L. Clark, C.P.A., 410 Nat. Bank of Tulsa Bldg., Tulsa 3, Okla., for the petitioners. Allen T. Akin, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $24,883.86 in income tax for 1940, resulting, in part, from the disallowance by respondent of a deduction of $383,734.40 for a loss alleged to have been sustained upon the surrender of title to certain tracts of land. The only issue involved herein is whether the disallowance of the deduction was proper. The parties agree that the only point for decision under the issue is the fair market value of the tracts on September 30, 1937. The stipulation of facts filed by the parties is incorporated herein by reference as part of our findings of fact. Findings of Fact The petitioners, husband and wife, residing in Oklahoma, filed a joint return for the taxable year on the cash basis with the collector for the district of Oklahoma. On September 30, 1937, petitioner E. P. Harwell, hereinafter referred to as the petitioner herein, acquired from a corporation in exchange for all of its stock in dissolution proceedings, *208 four tracts of land, containing an aggregate of about 4,500 acres, in the Dalas County Levee Improvement District No. 5. The accrued and unpaid taxes and penalties on the lands at that time amounted to $307,900.73. In January 1938 petitioner paid taxes in the amount of $273.42 on the property. Prior to and during 1940 the Improvement District was unable to collect from owners of land within the Improvement District sufficient taxes to pay installments due on the principal of its bonds and the interest thereon. In 1940, the District Court of the United States for the Northern District of Texas entered an order confirming a composition of indebtedness filed by the Improvement District, and pursuant thereto, some of the landowners paid in substantial sums to retire bonds and pay taxes, resulting in the cancellation or payment of all taxes and the retirement of all the bonds. The lands involved herein were surrendered and conveyed to the Improvement District by petitioner in 1940, for which he received no consideration, but his action avoided a personal judgment against himself for delinquent taxes upon his lands. The eastern extremity of the lands involved herein, referred to as the *209 Harwell land, was about three miles and the most westerly or northwesterly extremity about seven miles from the Union Station in Dallas, Texas. All of the land between the tract and Dallas was undeveloped. The town of Irving, Texas, is about three miles west of the western extremity of the property. The lands consisted of four tracts, as follows: Tract No. 1
2496.53 acres
Tract No. 2
300 acres
Tract No. 3
65.54 acres
Tract No. 4
1632.85 acres
Tracts Nos. 1 and 3 are protected by a levee constructed to take care of three times the highest known flood. Tract No. 2 had like protection but flood waters ran over it several times prior to 1937. Tract No. 4, known as Floodway lands, does not have such protection and is subject to overflow when the river gets out of its banks. From one-third to one-half of tract No. 1 is covered with water after heavy rains, and the roads leading to it are often closed on account of being covered with water. Industrial Boulevard, a main arterial highway connecting Dallas with Irving, runs through the southern part of tract No. 1. Grauwyler Road runs through the northern part of tract No. 1 and intersects Industrial Boulevard near *210 the western extremity of the tract. Another road, known as the Record Crossing Road, enters the tract from the east, and connects with Westmoreland Road, a paved road running north and south through the property. Westmoreland Road connects with Singleton Boulevard south of the Improvement District. Tract No. 2, located northwest of tract No. 1, has a highway through to Fort Worth. Tracks of the Chicago Rock Island Railroad paralleling Industrial Boulevard, run through the southern half of tract No. 1. The tracks were about 20 feet above the general level of the land. A high power electric line ran across a portion of the tract No. 1 on September 30, 1937. Gas lines traversed some of the land, not including tract No. 1. Tract No. 1 contained a sand hill of about 35 acres. Tests made developed that about 15 acres of it had a deposit of sand of an average depth of 10 feet and the remainder a depth of from three to five feet. The sand was very desirable for construction work and was being mined and sold on September 30, 1937. The tract also had a gravel pit. Sales of sand and gravel on a royalty basis amounted to about $3,000 annually. The improvements on the land consisted of a superintendent's *211 house, granaries, barns for the storage of crops, 20 to 25 houses for negroes, one or two silos and a store building, all of which were located on or near the sand hill. The area was served by a spur track, but the track was not being used in 1937. The spur track could not have been extended to other areas without filling in the land to avoid flooding. The improvements had a fair market value on September 30, 1937, of $12,000. Depreciation on the improvements from September 30, 1937, to the date of disposition in 1940, was $3,923.80. Business conditions in general in and around Dallas in 1937 were not very good and it was difficult to sell property. Dallas did not in 1937 have a so-called industrial area. At that time its industries were scattered around on all sides of the city, and there was no indication of the direction of future development. There was land at the end of Lamar underpass and on Lemmon Avenue in Dallas better suited for industrial development than the Harwell lands. In 1937 there were about 1,500 acres between the Harwell land and Dallas that had not been developed for industrial purposes. In addition thereto about 150 acres east of the Houston Street Viaduct *212 were available for that purpose, and there were about 3,000 acres along Eagle Ford Road, served by a railroad and a wide paved road, suitable for industrial development and a subdivision for housing industrial workers. In 1937 the largest residential development was to the southwest in Oak Ridge, across the Trinity River from the Harwell lands. There was no trend of development toward the Harwell lands except a very inexpensive development toward tract No. 3. In 1937 tract No. 1 was not first class residential property. In his return for 1940 the petitioner claimed a loss deduction of $383,734.34 on account of the surrender of the tracts to the Improvement District. The respondent disallowed the deduction upon the ground that the fair market value of the property on September 30, 1937, was not in excess of the indebtedness on the property at that time. On September 30, 1937, the tracts had fair market values an acre as follows: Tract No. 1 $125.
Tract No. 2
60.
Tract No. 3
60.
Tract No. 4
15.
Opinion The petitioner alleged in his petition that the land had a value when received on September 30, 1937, for stock of at least $448,480, leaving, after adjustments *213 for taxes and depreciation, a loss of $136,931.86 upon the surrender of the property in the taxable year. His three witnesses at the hearing testified to value of each tract aggregating from about $457,000 to $486,000, without any value for the improvements. The respondent offered testirr ony of two witnesses on the value, one of whom testified to a total valuation of about $296,000, and the other about $268,000, in each case without improvements. Only one of petitioner's witnesses placed a value on the improvements. He made no inspection or appraisal of the property. He testified that the improvements "might be valued around $15,000" and that "I just think, off hand, knowing what they have got there, it ought to be worth about $15,000." The two witnesses for the respondent valued the improvements at from $10,000 to $12,000, and respondent has accepted the higher of their values. We favor the opinions of respondent's witnesses as to the value of the improvements and, accordingly, have found as a fact that they had a fair market value on September 30, 1937, of $12,000. All of the witnesses testified to a value $15of an acre for tract No. 4. The valuation determined by us for that *214 tract merely follows the agreement of the witnesses on the value of the land. Concerning tract No. 3, two of petitioner's witnesses testified to a valuation of $40 an acre and the other to be a value of $75. The respondent's witnesses fixed a value of $60 an acre. Under all the circumstances we have accepted the latter as the best evidence of the value of the land on the basic date, and conclude it to be worth $60 an acre. As to tract No. 2, the valuations range from $60 to $75 an acre, two of petitioner's witnesses placing a value of $60, the other $75, and the valuations of respondent's witnesses being $50 and $60, respectively. Here we have accepted the lower of the valuations of petitioner's witnesses and the higher of respondent's experts as the best evidence on the question, and conclude the land to have a value of $60 an acre. A greater difference exists among the witnesses as to the value of the remaining and largest parcel, tract No. 1. A value of $165 an acre was testified to by one of petitioner's witnesses and a value of $175 by the other two. The witnesses for respondent fixed values of $90 and $100, respectively, an acre. It would serve no useful purpose to discuss *215 in detail the various factors considered by the witnesses in arriving at their valuations. There were no sales of comparable property to serve as a guide, which, in part, accounts for the wide difference in values. Another reason for the variation in value is due to the views of the witnesses for the respective parties on the value of the tract for development for industrial and residential purposes. Other property was available in and near Dallas for such purposes and there does not appear to have been any tendency for growth toward the tract in preference to other locations having acreage for like uses. The petitioner's witnesses gave considerable weight to the potentialities of the tract for industrial and residential development, particularly if all of the land was acquired. We think they placed too great a reliance upon such future use of the land, and that the witnesses for the respondent did not give the factor sufficient weight, or take sufficiently into account, the sand and gravel deposits on the tract. Petitioner's willingness to surrender the property in 1940 for outstanding taxes is not, without explanation, in line with the high values placed upon the property by his *216 witnesses, or in line with their reliance on future potentialities which the fact of surrender indicates did not develop, as to this property. Nothing is shown to have intervened (such as a depression or crash, similar to that in 1929) to explain such descent of values between September 1937 and 1940 as to cause abandonment of property. From all of the evidence we find that tract No. 1 had a fair market value on September 30, 1937, of $125 an acre. Decision will be entered under Rule 50.